No. 16-1089

## UNITED STATES COURT OF APPEALS
## DISTRICT OF COLUMBIA CIRCUIT

### RHINO NORTHWEST, LLC,
*Petitioner/Cross-Respondent*,

### v.

### NATIONAL LABOR RELATIONS BOARD,
*Respondent/Cross-Petitioner*,

### INTERNATIONAL ALLIANCE OF THEATRICAL STAGE EMPLOYEES, LOCAL 15,
*Intervenor*.

### PETITION FOR REVIEW
### FROM THE NATIONAL LABOR RELATIONS BOARD
[Not Yet Scheduled for Oral Argument]

### BRIEF FOR PETITIONER/CROSS-RESPONDENT

Timothy A. Garnett, D.C. Bar #56657
Heidi Kuns Durr, D.C. Bar #59863
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
7700 Bonhomme Avenue, Suite 650
St. Louis, Missouri 63105
Telephone: (314) 802-3940
timothy.garnett@ogletreedeakins.com
heidi.durr@ogletreedeakins.com

Brian E. Hayes
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
1909 K Street, N.W.
Suite 1000
Washington, D.C. 20006
Telephone: (202) 887.0855
brian.hayes@ogletreedeakins.com

Attorneys for Petitioner/Cross-Respondent Rhino Northwest, LLC

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Petitioner/Cross-Respondent Rhino Northwest, LLC states:

**A.    Parties and Amici**

Petitioner/Cross-Respondent: Rhino Northwest, LLC
Respondent/Cross-Petitioner: National Labor Relations Board
Intervenor: International Alliance of Theatrical Stage Employees, Local 15

**B.    Ruling Under Review**

The ruling under review is the December 17, 2015, Decision and Order of the National Labor Relations Board in Case 19-CA-160205, granting the General Counsel's motion for summary judgment related to the underlying representation proceeding in which Intervenor was certified as the bargaining representative. The Decision and Order is reported at 363 NLRB No. 72 and can be found in the Joint Appendix at [ ].

**C.    Related Case**

Counsel believes *Constellation Brands v. National Labor Relations Board*, No. 15-2442, pending in the United States Court of Appeals for the Second Circuit, involving the National Labor Relations Board as a party is a pending case that also involves the same or similar issues.

/s/ *Timothy A. Garnett*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1 and D.C. Circuit Rules 26.1 and 28(a)(1), Petitioner/Cross-Respondent Rhino Northwest, LLC states:

(a)     Petitioner discloses it has no parent company, and no publicly-held company has a 10% or greater ownership interest in it.

(b)     As relevant to this appeal, Rhino Northwest, LLC, located outside Seattle, Washington, provides technical professionals to set up, assist with, and take down concerts, trade shows, sporting events, and festivals at venues primarily throughout the Northwest region of the United States.

## <u>TABLE OF CONTENTS</u>

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATEMENT ........................................ ii

TABLE OF AUTHORITIES ...................................................vi

GLOSSARY.................................................................. xii

STATEMENT OF JURISDICTION.........................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................1

STATEMENT OF THE CASE...........................................................2

STATEMENT OF FACTS ...........................................................4

A.    Introduction..........................................................4

B.    All Rhino Employees Work As A Team Before, During and After
      Events...........................................................5

C.    All Rhino Employees Operate Under Identical Terms and Conditions
      of Employment .....................................................8

      1.    The Method of Compensation, Hours of Work, Benefits and
            Dress Code Are The Same For All Employees....................8

      2.    Working Conditions. ...........................................9

      3.    Rhino Employees Work as a Team: Their Duties Are Integrated
            and They Have Frequent Contact With Each Other. ............9

      4.    All Rhino Employees Share the Same Supervisor.............12

      5.    Local and Historical Bargaining Patterns Reflect the Highly
            Integrated and Interchangeable Nature of the Staging Industry
            Workforce.......................................................13

SUMMARY OF ARGUMENT ..............................................14

STANDING ...........................................................16

iii

ARGUMENT ............................................................................................16

I.    THE STANDARD OF REVIEW. .................................................16

II.   THE BOARD'S BARGAINING UNIT DETERMINATION WAS
      NOT SUPPORTED BY SUBSTANTIAL EVIDENCE IN THE
      RECORD AS THERE IS AN OVERWHELMING COMMUNITY
      OF INTEREST BETWEEN THE EMPLOYEES INSIDE THE UNIT
      AND THOSE EMPLOYEES EXCLUDED FROM THE UNIT ................17

      A.   All Stagehands, Including Riggers, Have Similar Terms and
           Conditions of Employment. .................................................19

      B.   Riggers and Other Stagehands Perform Similar Work And
           There is Frequent Contact and Interchange Among Them. ...............20

      C.   All Stagehands Work In Close Geographic Proximity To Each
           Other. ......................................................................21

      D.   Some of the Riggers' Skills Are Shared By Others, and Most of
           the Riggers Do Non-Rigging Work. ...................................21

      E.   All Stagehands Have Common Supervision. .....................................22

      F.   Riggers Have Historically Been In a Bargaining Unit With
           Other Stagehands in Seattle. ................................................23

      G.   Rhino Met Its Burden of Showing That The Excluded Workers
           Have An Overwhelming Community of Interest With Riggers. ........24

III.  IF THE COURT FINDS THERE IS NO OVERWHELMING
      COMMUNITY OF INTEREST, THEN THE COURT SHOULD
      REJECT THE BOARD'S USE OF THE "OVERWHELMING
      COMMUNITY OF INTEREST" TEST AS STATED IN *SPECIALTY
      HEALTHCARE AND REHABILITATION CENTER OF MOBILE*, 357
      NLRB NO. 83 (2011) BECAUSE IT VIOLATES THE NLRA AND
      THE ADMINISTRATIVE PROCEDURES ACT. .....................................25

      A.   The Initial Unit Determination Methodology Announced in
           *Specialty Healthcare* And Applied Here Violates Section 9(b)
           Because The Board Does Not Determine Initial Units "In Each
           Case." ......................................................................25

B.      The New Standard Does Not Assess A Proposed Unit In Terms
        Of Its Propriety "For The Purposes Of Collective-Bargaining." ........36

C.      Contrary To The Statute, The New Standard Reverses The
        Presumption In Favor of Larger Bargaining Units. ...........................40

D.      The New Standard Violates The Act By Failing to Consider All
        Of The Rights Guaranteed By The Act When Making Unit
        Determinations. ..................................................................................45

E.      The Adoption Of The New Standard Was An Abuse Of
        Discretion And Violates The Administrative Procedure Act. ............47

        1.      Rulemaking is distinct from adjudication under the APA........47

        2.      In *Specialty Healthcare*, the Board improperly used
                adjudication to implement a new generally applicable
                standard for determining bargaining units. ..............................48

        3.      The Board's abuse of discretion was prejudicial error. ............50

CONCLUSION ........................................................................................51

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .....................................53

CERTIFICATE OF SERVICE ...........................................................................54

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                    **Page(s)**

*Aerospace Corp.*,
    331 NLRB 561 (2000) ....................................................................44

*Am. Airlines, Inc. v. Dep't of Transp.*,
    202 F.3d 788 (5th Cir. 2000) ..........................................................49

*Am. Fed'n of Lab. v. NLRB*,
    308 U.S. 401 (1940)........................................................................48

*Appliance Supply Co.*,
    127 NLRB 319 (1960) ....................................................................42

*ASV, Inc.*,
    360 NLRB No. 138 (2014) ..............................................................31

*AT Wall*,
    361 NLRB No. 62 (2014) ................................................................34

*\*Blue Man Vegas, LLC v. NLRB*,
    529 F.3d 417 (D.C. Cir. 2008)............................................ 18, 19, 24, 33, 34, 35

*Burns & Roe Services, Corp.*,
    313 NLRB 1307 (1994) ..................................................................33

*Charrette Drafting Supplies Corp.*,
    275 NLRB 1294 (1985) ..............................................................37, 43

*City of Arlington, Tex. v. F.C.C.*,
    668 F.3d 229 (5th Cir. 2012) ......................................................48, 49

*Daniel Finley Allen & Co.*,
    303 NLRB 846 (1991) ....................................................................42

*DTG Operations, Inc.*,
    357 NLRB No. 175 (2011) ......................................................26, 29, 32, 50

*Fibreboard Paper Products Corp. v. NLRB*,
    379 U.S. 203 (1964).......................................................................36

vi

*First National Maintenance Corp. v. NLRB*,
   452 U.S. 666 (1981).................................................................................36

*Fraser Engineering*,
   359 NLRB No. 80 (2013) ...................................................................30

*Frontier Tel. of Rochester, Inc.*,
   344 NLRB 1270 (2005), enf'd. by 181 F. App'x. 85 (2d Cir. 2006)................34

*Guide Dogs for the Blind, Inc.*,
   359 NLRB No. 151 (2013) .............................................................26, 28

*Haag Drug Co.*,
   169 NLRB 877 (1968) .......................................................................37

*Hallam & Boggs Truck & Implement Co.*,
   92 NLRB 1339 (1951) .......................................................................44

*Holiday Inn City Center*,
   332 NLRB 1246 (2000) .....................................................................35

*Home Box Office, Inc. v. F.C.C.*,
   567 F.2d 9 (D.C. Cir. 1977) ..............................................................51

*I. Magnin & Co.*,
   119 NLRB 642 (1957) ...................................................................37, 42

*Jackson Liquors*,
   208 NLRB 807 (1974) .......................................................................42

*Jersey Shore Nursing & Rehabilitation Center*,
   305 NLRB 603 (1998) .......................................................................42

*Jewish Hospital of Cincinnati*,
   223 NLRB 614 (1976) .......................................................................35

*Kalamazoo Paper Box Corp.*
   136 NLRB 134 (1962) .......................................................................42

*Levitz Furniture Co.*,
   192 NLRB 61 (1971) .........................................................................37

*Local 24, Int'l Brotherhood of Teamsters v. Oliver*,
   358 U.S. 283 (1959) ..................................................................36

*Macy's Inc. and & Local 1445, UFCWU*,
   361 NLRB No. 4 (2014) ......................................................46, 47

*May Department Stores Co.*,
   97 NLRB 1007 (1952) .............................................................42

*Milwaukee City Ctr., LLC*,
   354 NLRB 551 (2009) .............................................................34

*Montgomery Ward & Co.*,
   150 NLRB 598 (1964) .............................................................43

*NLRB v. Catalytic Indus. Maint. Co. (CIMCO)*,
   964 F.2d 513 (5th Cir. 1992) ...................................................38

*NLRB v. Fid. Maint. & Constr. Co.*,
   424 F.2d 707 (5th Cir. 1970) ...................................................40

*NLRB v. Great Western Produce, Inc.*
   839 F.2d 555 (9th Cir. 1988) ...................................................35

*NLRB v. Lundy Packing Co.*,
   68 F.3d 1577 (4th Cir. 1995) ...................................................17

*NLRB v. Purnell's Pride, Inc.*,
   609 F.2d 1153 (5th Cir. 1980) .................................26, 35, 37, 41

*NLRB v. Superior Protection, Inc.*,
   401 F 3d 282 (5th Cir. 2005) ...................................................34

*NLRB v. WKRG-TV, Inc.*,
   470 F.2d 1302 (5th Cir. 1973) .................................................25

*NLRB v. Yeshiva University*,
   444 U.S. 672 (1980) ................................................................26

*Neiman Marcus Group, Inc.*,
   361 NLRB No. 11 (2014) ........................................................31

*NLRB v. ADT Security Services, Inc.*,
689 F. 3d 628 (6th Cir. 2012) ...............................................................35

*Northrop Grumman Shipbuilding*, *Inc.*,
357 NLRB No. 163 (2011) ..............................................26, 29, 43, 50

*NV Energy*,
362 NLRB No. 5, slip op. (2015) ......................................................33

*\*Odwalla, Inc.*,
357 NLRB No. 132 (2011) .................................................17, 31, 50

*PECO Energy Co.*,
322 NLRB 1074 (1997) ...................................................................30

*Pittsburgh Plate Glass Co. v. NLRB*,
313 U.S. 146 (1941) ........................................................................36

*Rhino Northwest*,
363 NLRB No. 72 ............................................................................37

*Safeway Stores, Inc.*,
256 NLRB 918 (1981) .....................................................................33

*Science Applications Corp*.,
309 NLRB 373 (1992) .....................................................................44

*Sears, Roebuck & Co.*,
261 NLRB 245 (1982) .....................................................................43

*Shell Offshore Inc. v. Babbitt*,
238 F.3d 622 (5th Cir. 2001) ...........................................................49

*Sierra Club v. U.S. Fish & Wildlife Serv.*,
245 F.3d 434 (5th Cir. 2001) ...........................................................50

*Specialty Healthcare and Rehabilitation Ctr. of Mobile*,
357 NLRB No. 83 (2011) ............................ 1, 14, 16, 17, 25, 27, 28, 29, 30, 32,
33, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51

*\*Sundor Brands, Inc. v. NLRB*,
168 F.3d 515 (D.C. Cir. 1999)..................................................16, 25

*Typecraft Press*,
    275 NLRB 553 (1985) ......................................................................44

*U.S. Steel Corp. v. E.P.A.*,
    595 F.2d 207 (5th Cir. 1979) ......................................................50, 51

*Westinghouse Electric Corp. (Westinghouse I)*,
    137 NLRB 332 (1962) ......................................................................30

*Westinghouse Electric Corp. (Westinghouse II)*,
    300 NLRB 834 (1990) ......................................................................30

*Authorities upon which Petitioner chiefly relies are marked with asterisks.

**Statutes**

5 U.S.C. § 551 ..........................................................................47, 48

5 U.S.C. § 701-706...........................................................................48, 50

29 U.S.C. § 157 ...............................................................................45

29 U.S.C. § 159(b) .....................................................................15, 17, 45

29 U.S.C. § 159(c)(5)...........................................................................17

29 U.S.C. § 160(f) ...........................................................................1, 16

NLRA .................................................................................1, 5, 15, 17

Wagner Act, ch. 372, § 9(b), 49 Stat. 449, 453 (1935)..................25, 32, 35, 36, 37,
                                                          38, 39, 40, 45, 46, 47

**Other Authorities**

*CNH America, LLC*, No. 25-RC-116569 (January 16, 2014) .................................32

*First Aviation Servs., Inc.*, No. 22-RC-061300 ........................................32

H.R. Rep. No. 80-510 (1947) (Conf. Rep.), *reprinted* in 1 NLRB,
    *Legislative History of the Labor Management Relations Act of
    1947* ....................................................................................46

*Hearings Before the S. Comm. On Educ. & Lab. on S. 1958*, 74th
    Cong. 82 (1935), reprinted in 1 NLRB, *Legislative History of the
    Labor Management Relations Act of 1947,* (1948) ..............................................41

*Nestle Dryer's Ice Cream*, No. 31-RC-66625 (Dec. 28, 2011) ................................32

*Prevost Car U.S.*, No. 03-RC-071843 (Mar. 16, 2012)...........................................32

*Swissport USA, Inc.*, No. 29-RC-144512 (March 26, 2015) ...................................32

# **GLOSSARY**

Board ....................................................................... National Labor Relations Board

NLRA or Act.............................................................. National Labor Relations Act

## STATEMENT OF JURISDICTION

Pursuant to 29 U.S.C. § 160(f), this Court has jurisdiction over Petitioner's petition for review of the Board's "Decision and Order" dated December 17, 2015. The Board's Decision and Order is a final order within the meaning of Section 10(f) of the National Labor Relations Act, and Petitioner is a party aggrieved by said order. Petitioner timely filed its petition for review on December 30, 2015, before the Fifth Circuit Court of Appeals. The case was transferred to this venue and docketed on March 4, 2016.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.     Whether the Board's decision to approve a bargaining unit consisting only of stagehands who perform rigging work out of Petitioner's Fife, Washington facility, and excluded employees who shared an overwhelming community of interest with these bargaining-unit employees, constitutes a "unit appropriate for the purposes of the collective bargaining" under the NLRA or was arbitrary, capricious, an abuse of discretion, or lacking in substantial evidentiary support.

2.     Alternatively, if the "overwhelming community of interest" standard articulated in *Specialty Healthcare and Rehabilitation Ctr. of Mobile*, 357 NLRB No. 83 (2011), is deemed not to have been satisfied in the present case, then whether the Court should review and reject that standard because it is illusory and/or at odds with the fundamental purposes of the NLRA.

## STATEMENT OF THE CASE

Petitioner Rhino Northwest, LLC, located just outside of Seattle, Washington provides stagehands to set up concerts, trade shows events, sporting events and festivals (Appendix ("A"), p. 27). Rhino provides staging service primarily in the Northwest but it also assists throughout other parts of the country (A. 28). Some of the venues that Rhino regularly works are the Tacoma Dome, White River Amphitheater, the Northwest Amphitheater, Xfinity Arena, the ShoWare Center, the Gorge Amphitheater, Chambers Bay Golf Course, as well as hotels in the Seattle area (A. 28-29).

On May 26, 2015, the Intervenor, International Alliance of Theatrical Stage Employees (IATSE), Local 15 ("Union") filed a petition with the Board seeking to be certified as the collective-bargaining representative in a unit consisting only of Rhino's riggers, but excluding its other "stagehands, grips, truck loaders, forklift drivers, electricians, carpenters, wardrobe, and follow spot operators" (A. 363).

On June 4 and 5, 2016, a pre-election representation hearing was held. On June 18, 2015, the Board's Regional Director for Region 19 issued a Decision and Direction of Election ("DDE"), finding that the following employees of Rhino constituted a unit appropriate for the purposes of collective bargaining:

> All full-time and regular part-time riggers, including boom lift riggers, ballroom riggers, decorating riggers, down riggers, ETCP high riggers, fly operators, head riggers, head fly operators, high riggers, high rigger

> trainees, high rigger welders, installation riggers, roof operators, roof supervisors, and rigging trainees, employed by the Employer out of the facility, excluding all other employees, guards and supervisors as defined by the Act.

(A. 466).

Pursuant to the DDE, a Board-supervised mail ballot election was conducted and the ballots were counted on July 17, 2015. A tally of the ballots revealed that 27 votes were cast in favor of union representation and 22 against (Rev. Tally of Ballots). On August 3, 2015, the Acting Regional Director of Region 19 certified the Union as the collective bargaining representative for the unit (A. 470). On August 17, 2015, Rhino filed with the Board a timely Request for Review of the Regional Director's DDE (A. 475-88). On November 30, 2015, the Board denied the Request for Review (A. 518).

In order to obtain judicial review, Rhino refused to meet and bargain with the Union. Following Rhino's technical refusal, Counsel for the General Counsel of the NLRB, moved to transfer the case to the Board, and requested that the Board issue a Decision and Order granting summary judgment against Rhino. Rhino opposed the General Counsel's summary judgment motion. On December 17, 2015, the Board issued its Decision and Order adopting the Regional Director's unit determination (A. 519-21). Rhino now seeks the Court's review of the Board's Decision and Order.

## STATEMENT OF FACTS

### A.    Introduction

The employees that the Board included in its unit finding not only perform highly integrated work with those employees it excluded, the two routinely perform identical work. Thus, the included riggers regularly perform the same work as the stagehands and others that the Board has excluded. Indeed, nearly 80% of Rhino's riggers perform work outside the petitioned for unit. By some record estimates, between 14 to 50 percent of a rigger's time is devoted to "non-rigging" tasks—often times at the same event and even on the same day. Similarly, the excluded stagehands, perform "rigging" tasks on a regular basis. Indeed, when filling workforce vacancies, Rhino does not typically advertise for "riggers." Rather, it advertises for experienced stagehands.

Apart from often performing identical work, the included riggers, and all of Rhino's remaining excluded employees work side-by-side, performing highly integrated tasks in a tightly coordinated manner, under the direction of the same supervisor. They enjoy precisely the same terms and conditions of employment.

The highly integrated and interchangeable nature of work in the staging industry is reflected not only in Rhino's everyday operations, but in the bargaining pattern between the Union herein, and other Northwest employers. Thus, in virtually all of the approximately 70 collective-bargaining agreements presently in

4

effect between IATSE, Local 15, and other employers in the Pacific Northwest virtually all[1] cover riggers, stagehands, and others are in a single unit.

### B.     All Rhino Employees Work As A Team Before, During and After Events

Were one a spectator sitting in the stands at a venue, like the Seattle Dome, and watching Rhino employees prepare for a concert, you would first see a group of 40 or 50 employees gathered around a single supervisor conducting a pre-staging meeting. All of the workers would be wearing hard hats, black shirts, black pants, steel toed shoes, and carrying a tool bag. All of these Rhino employees would be gathered to discuss how the venue will be laid out with respect to the stage, lighting, audio and any other special effects that the production company requires as well as safety issues (A. 55, 62, 130). During this "load in" process, a group of employees called loaders, will unload tractor trailer trucks full of equipment, either by rolling large boxes off a truck or using forklifts to place equipment in place (A. 31-32). The unloaded equipment includes lighting, audio, props, staging equipment, wires, ropes, and the truss that supports lighting, and sometimes audio equipment (*Id.*). Once the equipment is unloaded, all

---

[1] As set forth in detail below, out of 70 collective-bargaining agreements the testifying Local 15 official "thought" that "maybe" three or four were limited to "riggers only." The witness, however, could only think of one such agreement. As it turned out, that employer only employed riggers – it had no other employees (A. 357).

5

employees—riggers, stagehands, lighting technicians and audio technicians—work together to unload the boxes and begin the assembly process (A. 33).

One of the first pieces of equipment built is the truss. The truss, is made of aluminum, and once it is assembled it is used to hang the lights, video equipment, and audio equipment (A. 34). While riggers and lighting technicians work together to assemble the truss, carpenters are assembling the stage and props that go on the stage (A. 35, 132).

To prepare the truss for being lifted to the top of the stadium, the riggers are responsible for attaching chain motors to the structural beams in the roof of the venue (A. 38). Once the riggers, stagehands, lighting technicians, and audio technicians have secured all of the concert equipment to the truss, the riggers will then attach the chain motor to the truss and hoist up the truss until it reaches the desired height in the upper support structure of the building (A. 37-38, 278). The stagehands and riggers work side-by-side to get the truss assembled and ready to hoist (A. 132). Before the truss is hoisted, the riggers will check to make sure the lights are secured properly by the lighting technicians (A. 279).

Once the show is underway, many riggers perform a variety of stagehand functions, such as operating the truss lights, spotlights, and the audio board (A. 291, 390-403, 406-409, 423-30). Riggers also work with other employees to

6

perform such tasks as dismantling wind walls at outdoor events when required (A. 119-23, 285).

Riggers often work together with and interchange duties with other excluded employees. For example, at the 2015 U.S. Open Championship at Chambers Bay Golf Course, a roof structure had to be positioned over the top of a bar and TV area. Riggers and carpenters worked together to assemble and hoist the roof in place (A. 105-106). Also, for example, at Chambers Bay, Rhino employee Meranda McNeill, worked not only as a rigger, but she also worked as seamstress and as a lighting operator (A. 108, 111-12, 404, 406-407). Working multiple tasks at a single event, like McNeill, is common for Rhino employees (A. 112). Again, for example, employee Kyle Bove performed both stagehand and high rigger work at Chambers Bay Golf Course (A. 113, 408-409).

Stagehands often do "rigger work" and vice-versa. For example, at a Miranda Lambert concert, stagehands Andrew Alexander, Paul Collins, George Howard, Bobby Berger were all assigned to do "pickling work," which is typically a "rigger task" (A. 116, 410-11). Conversely, Paul Collins, a rigger, worked as a stagehand at a Luke Bryan Concert held right before the hearing in this matter. (A. 117, 413).

When an event or show is over, the riggers are responsible for bringing down the truss with all of the equipment on it, and then working with lighting and

audio employees to disassemble the equipment and the truss. Other employees are responsible for disassembling the stage and props and reloading all of the equipment back in the tractor trailer trucks to be transported to the next venue (A. 42, 404).

### C. All Rhino Employees Operate Under Identical Terms and Conditions of Employment

1. <u>The Method of Compensation, Hours of Work, Benefits and Dress Code Are The Same For All Employees</u>.

Rhino employees work under a single handbook that applies to all stagehands:

> Information contained in this Manual applies to all stagehands of Rhino. For the purposes of this Manual, the terms employee, part-time employee, on-call employee and stagehand will refer to all on-call field employees including, but not limited to all technician departments, carpenters, lift operators, riggers, camera operators, electricians, safety coordinators, deck hands, spot light operators, loaders and more.

(A. 64-69, 370).

Rhino employees also enjoy the same benefits and pay structure. For example, Rhino employees are paid by the hour and paid for a minimum of four hours of work when they show up to work an event (A. 67). All employees are paid overtime after 40 hours worked in a week and sometimes after 10 hours in a day. They are paid time-and-one-half on holidays (A. 67-69). All Rhino employees must abide by the same dress code. They are required to wear all black and to wear

8

personal protective equipment (A. 234, 286-87, 374, 452). During corporate clients' events, all Rhino employees wear collared shirts (A. 234).

### 2.     Working Conditions.

Rhino employees obviously work under the same conditions, when working together in the same venue. Beyond that, however, there are times when the Rhino crews work around-the-clock at certain events, such as the Sasquatch Event at the Gorge Amphitheater.  In those instances, all the Rhino employees share the same kitchen and dining and shower facilities (A. 324).

### 3.     Rhino Employees Work as a Team: Their Duties Are Integrated and They Have Frequent Contact With Each Other.

Preparing a venue for a concert or other event was accurately described in the record as "a dance," "organized chaos," or a "long train moving in the same direction" (A. 43, 190-91). To insure that the "show will go on" requires a collective effort amongst the riggers, stagehands, lighting, audio loaders and the rest of the crew. One classification, such as riggers, cannot work alone (A. 190-92).

Even the union's own witness, Heidi Gonzalez, conceded that the staging work cannot be done with just riggers, but requires a coordinated effort (A. 296). Riggers, stagehands, carpenters, lighting, audio personnel, working together, are needed to put on the show (A. 44-45, 296-97). None of the Rhino employees work in isolation. They work as a team (A. 46-47). CEO Jeff Giek testified:

> An example would be the lighting crew…bulking together the truss while one of the down riggers would come along and ask the lighting guys to attach span set, which are basically straps that you attach the rigging motor to the truss with. And they may take a group of stagehands and – or lighting guys and say, "hey, you guys go and attach the truss to the motors, while we're running up to get it to the working height." So they raise the truss up to a safe working height to hang instruments on the truss—all the lighting equipment.

(A. 43-44).

Riggers that testified at the hearing conceded they devote considerable portions of their time doing non-rigging work. Gonzalez, a rigger, and the union's witness admitted she spent well over 10% of her time doing non-rigging work, Other riggers testified that their non-rigging work occupied over 20 percent of their respective time, up to 50 percent. Union witness and rigger Kyle Dailey spends 21 percent of his time doing non-rigging work (A. 127-28, 360, 390-403).

Moreover, rarely do Rhino riggers work only as riggers. Of the 63 riggers listed in the company's statement of position, only 14 performed just rigging responsibilities in a 12 month period (A. 390-403).[2] Rhino also presented specific

---

[2] Employer exhibit 3.b. was the initial list of petitioned for voters submitted with the employer's statement position prior to the representation hearing. That list included 82 employees (A.390-403). The final voter list (also known as the Excelsior List) was pared down to just 66 voters as a result of eliminating employee names that were incorrectly included in the initial list. The statistic of 78% only includes those employees that correctly appeared in both employer exhibit 3b and the final voter list.

examples of employee after employee who performed not only rigging responsibilities but non-rigging responsibilities during the same event (A. 404-414, 423-38). There were just a many examples of riggers working hand in hand with non-riggers on a regular basis:

- Both riggers and stagehands are responsible for working on wind walls (A. 119-21, 124).

- Stagehands and riggers are responsible for erecting tents (A. 60-61).

- Both riggers and stagehands are responsible for hoisting and carrying heavy objects (A. 125-26).

- Riggers, stagehands, and carpenters perform the same tasks, such as material handling and material fabrication (A. 106).

- Carpenters and riggers work together installing a large roof structure inside of a tent (A. 106, 124).

- Stagehands also climb and help hang motors (A. 43-44, 279).

- Stagehands disassemble shackles, stand sets, steel, which is a rigger task (A. 125-26).

- Stagehands work side-by-side with riggers hanging lights on the truss and other equipment (A. 119-21, 124).

- Before every load in process begins, there is one meeting where all employees attend to go over the production company's requirements and safety issues (A. 130-31).

- The lighting and carpentry teams help assemble the truss structure, along with the riggers (A. 132).

- Riggers work as stagehands (A. 108-109, 113, 116, 118, 404-407, 410-11, 413).

- Riggers work as a seamstress (A. 111, 406-407).

- Employees work both as a stagehand and high rigger at the same event (A. 113-15, 408-409).

According to show supervisor Eric Drda, this interchange between stagehands and riggers happens at almost every show (A. 126).

Because those who do rigging work can and do so many other stagehand tasks (such as being a truss light operator or basic stagehand), Rhino rarely advertises for riggers. When Rhino looks for workers, they advertise for stagehands. It is from those pool of stagehands that it often finds employees qualified to do rigging work (A. 213, 415-22).

### 4.    All Rhino Employees Share the Same Supervisor.

Rhino has only two show supervisors. At an event, the entire crew reports to the show supervisor—either Eric Drda or Dan Scolnik (A. 49-51). There is also a rigging manager Tyler Alexander, who assists the show supervisor (A. 49).[3] Although Alexander's title is rigging manager, he has overall responsibility for safety of the entire crew, he participates in the hiring process for all employees, and sometimes directly supervises stagehands and others (A. 233, 256). The show supervisor, however, is responsible for the entire crew (A. 50, 103, 136).

---

[3] Although there are occasional references to departments at Rhino, there are no formal departments (A. 54, 451-55).

5.    <u>Local and Historical Bargaining Patterns Reflect the Highly Integrated and Interchangeable Nature of the Staging Industry Workforce</u>.

The Union's business agent, Aaron Gorseth, testified that virtually all of IATSE's contracts in the Pacific Northwest include riggers in the same bargaining unit with stagehands and other relevant classifications. Gorseth testified that IATSE Local 15, is signatory to approximately 70 collective bargaining agreements ("CBA") (A. 347). One of those agreements is referred to as "The Big 4" agreement (A. 346). That CBA covers the Seattle Opera, Pacific Northwest Ballet, the Seattle Symphony, and Benaroya Hall (A. 346, 439). The Big 4 agreement encompasses 12 to 14 job classifications, covering stagehands (referred to as grips) and riggers in the same bargaining unit and under the same CBA (A. 348-49). IATSE Local 15 CBA with Paramount also includes both stagehands and riggers (A. 351-52, 440). The same is true for the Seattle Center, Langston Hughes Performing Arts Center, and Local 15's "general contract" that covers employers who do short-term productions in the Seattle area (A. 351-52, 354-57, 441-42). Out of the 70 Local 15 CBAs, Gorseth testified that only three or four are rigger-only CBAs (A. 358). Gorseth, however, could only specifically identify one CBA that was a rigger-only agreement. That one was with Dictalay Rigging, which, as the record demonstrates, *does not have any employees other than riggers* (A. 357).

13

## SUMMARY OF ARGUMENT

The Board correctly concluded that the riggers share a community of interest. The Board abused its discretion, however, when it concluded that the excluded employees[4] work separately from the riggers, perform distinct tasks, are separately supervised, and generally have infrequent and limited interchange with the riggers. In reaching this conclusion, the Board simply ignored substantial and undisputed evidence in the record. Indeed, the record amply demonstrates that excluded Rhino employees clearly share an "overwhelming community of interest" with the included riggers. Thus, under a proper construction of the standard set forth by the Board in *Specialty Healthcare and Rehabilitation Center of Mobile*, 357 NLRB No. 83 (2011) a unit limited to the Employer's riggers, and excluding its stagehands and other employees, is not appropriate.

Alternatively, if the "overwhelming community of interest" standard articulated in *Specialty Healthcare* is deemed not to have been satisfied in the present case, then the Court should review and reject that standard on either, or both, of two grounds. First, the "standard" should be rejected because it is simply

---

[4] The excluded employees are audio visual technicians, audio set/strike technicians, breakout room operators and roamers, carpenters, cable pullers, camera operators, climbers/scaffers, crew chiefs, fork lift drivers, deckhands, loaders, master electricians, pushers, props, rope access technicians, seamstresses, spot light operators, stagehands, truss light operators, video set/strike technicians, and wardrobe.

14

unattainable, and therefore illusory. In practical terms, the existence of such an illusory "standard" means that whenever a petitioner seeks a unit confined to a single department, or a single job classification it will always be deemed appropriate, and can never be expanded since any other classification or department, *by definition*, has some distinctions from the classification or department requested. Such a *per se* classification or departmental rule is not sanctioned by the NLRA, and contravenes the requirement that the Board must determine the appropriate unit in each case. 29 U.S.C. § 159(b). Second, if the "standard" is not satisfied in the present case, then the "standard" is plainly at odds with the fundamental purposes of the NLRA. The Board's principal responsibility in determining the contours of a bargaining unit is to find a unit that is appropriate *for the purposes of collective-bargaining.* In other words, a unit structure that advances the Act's goals of promoting rational and productive bargaining and facilitating industrial peace. The unit determination here has precisely the opposite effect. Thus, because of the nature of the employer's business it would yield a bargaining unit in which its members must cycle in and out of the unit and the coverage of any collective-bargaining agreement on a regular daily basis. Thus, riggers routinely perform both rigging and non-rigging work during the course of the day. It would also mean that employees that were not members of the unit or covered by any collective bargaining agreement would cycle in and out of work

15

performed by unit members. Further still, it would take employees that not only share duties on a regular basis, but that work together in a highly coordinated fashion, under similar terms, and supervision, and artificially "stovepipe" all their incidents of employment. The Board cannot mandate that the highly integrated nature of the business be altered. It must fashion a unit that makes sense within the confines of the pre-existing work environment. If this is the practical result of its *Specialty* "standard" then it is antithetical to the core purposes of the Act and cannot stand.

## STANDING

Petitioner has standing to seek review of the Board's Decision and Order because it is a final order and Petitioner is a party aggrieved by said order under 29 U.S.C. § 160(f).

## ARGUMENT

## I.     THE STANDARD OF REVIEW.

Courts may not enforce a Board's bargaining unit determination if it is arbitrary or not supported by substantial evidence in the record. *Sundor Brands, Inc. v. NLRB*, 168 F.3d 515, 519 (D.C. Cir. 1999).

## II.    THE BOARD'S BARGAINING UNIT DETERMINATION WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE IN THE RECORD AS THERE IS AN OVERWHELMING COMMUNITY OF INTEREST BETWEEN THE EMPLOYEES INSIDE THE UNIT AND THOSE EMPLOYEES EXCLUDED FROM THE UNIT.

The NLRA requires the Board to determine "the unit appropriate for the purposes of collective bargaining." 29 U.S.C. § 159(b). The Board held in *Specialty Healthcare* that a unit is appropriate if the unit is readily identifiable and if employees in that unit share a community of interest. *Specialty Healthcare & Rehabilitation Ctr. of Mobile*, 357 NLRB No. 83, *7 (2011). But if other employees share an "overwhelming community of interest" with the designated unit, the Board's unit determination is not appropriate. *Id.* Accordingly, fractured bargaining units, or combinations of employees that have no rational basis, are inappropriate. *Odwalla, Inc.*, 357 NLRB No. 132 (2011).

Although the Board has broad discretion to determine the appropriate collective bargaining unit, that discretion is not without limits. The NLRA states that "[i]n determining whether a unit is appropriate … the extent to which the employees have organized shall not be controlling." 29 U.S.C. § 159(c)(5). This means that the union's organizing efforts may not be the dominant factor in the Board's decision to approve the unit and, in fact, "the Board violates the statute if it presumes the appropriateness of [the union's] proposed unit." *NLRB v. Lundy Packing Co.*, 68 F.3d 1577, 1580-81 (4th Cir. 1995).

17

That is what happened in this case. The Union petitioned to represent "[a]ll riggers" and excluded "stagehands, grips, truck loaders, forklift drivers, electricians, carpenters, wardrobe, [and] follow spot operators" (A. 363). The Regional Director ("RD") issued a Decision and Direction of Election ("DDE") finding the collective bargaining unit would be exactly what the Union requested: "All full-time and regular part-time riggers" (A. 46-69). Without any explanation, the Board upheld the RD's unit determination (A. 470).

The Board's decision to uphold the unit solely of riggers, and not include the rest of the workers who make up the entire crew (all of the employees who report to the show supervisor), is arbitrary and not supported by substantial evidence in the record. "The Board's principal concern in evaluating a proposed bargaining unit is whether the employees share a 'community of interest.'" *Blue Man Vegas, LLC v. NLRB*, 529 F.3d 417, 421 (D.C. Cir. 2008). Although the Court recognized there is no definitive list of factors to consider, and this determination must be made on a case-by-case basis, it did identity eight factors that should be considered. Those factors are "whether, in distinction from other employees, the employees in the proposed unit have 'different methods of compensation, hours of work, benefits, supervision, training and skills; if their contact with other employees is infrequent; if their work functions are not integrated with those of

other employees; and if they have historically been part of a distinct bargaining unit.'" *Id.*

Here, the record evidence establishes that there is no legitimate basis to exclude the rest of the stagehands from the unit, as there is a community of interest in their methods of compensation, hours of work, benefits, supervision, contact with each other, integration of their work functions, and history as a distinct bargaining unit. In fact, seven of the eight community of interest factors identified by the Court in *Blue Man* are shared by the riggers and the excluded workers, making the community of interest "overwhelming" and, thus, the designated unit inappropriate.

## A.     All Stagehands, Including Riggers, Have Similar Terms and Conditions of Employment.

When Rhino advertises for workers, it only seeks stagehands. Stagehands may have different work experiences and skills that lend themselves to performing certain tasks, but all employees are stagehands. Rhino does not advertise for "rigging," "wardrobe" or other discrete tasks, and those employees who fill those tasks are not treated separately. Rhino's employee handbook is addressed to all stagehands, and every policy in the handbook applies equally to everyone. While work assignments are handed out by employees' abilities and preferences for what they want to do, with wages based on the task, all stagehands are paid by the same method (hourly wage) and called for a minimum of four hours of work. And all

stagehands receive overtime, holiday pay, and other benefits of employment on an identical basis.

**B.    Riggers and Other Stagehands Perform Similar Work And There is Frequent Contact and Interchange Among Them.**

Once the stagehands are assigned their general responsibilities, they all work in concert to get the job of loading in, putting on the show, and loading out completed in a safe and efficient manner. From the first crate to be unloaded until the last crate is loaded back on the trucks, all of the stagehands—including riggers—work together, often side-by-side and even on the same piece of stage equipment. An illustration of this is when the riggers, lighting, electricians, audio, and other stagehands work together to place the lights and audio equipment on the truss that is then hoisted high above the stage. They all work together to get this task completed, with everyone checking each other's work to make sure the lights and audio are secured onto the truss, and then all of them helping during the truss-raising process. The process to get this complicated project done is a "dance," with all of the employees working together such that it is difficult to discern which employee is doing which discrete part of this process. This is because in truth, each employee is not performing a discrete, independent task but, instead, all of the employees are working together to get the overall job done. This process is not just limited to the truss. This teamwork repeats itself with the gags, props, and wind walls.

20

The Board's focus on the riggers' use of motors to hoist the truss, gags, and other objects into the air as a distinction to find a separate unit appropriate completely misses the mark. The motors are such a small part of the process and, as discussed below, are even used by non-riggers. Even if riggers were the only employees who used motors, which they are not, that distinction is not enough to make riggers an identifiable group.

**C.     All Stagehands Work In Close Geographic Proximity To Each Other.**

Because of the nature of Rhino's business staging concerts, festivals, and other events, all of the stagehands work together at the same venue with most of the work focusing on building the stage, the truss, and positioning all the lights and audio equipment for the performance or event. This is undisputed, and is another factor in favor of finding a community of interest exists to include all of the stagehands in the unit determination.

**D.     Some of the Riggers' Skills Are Shared By Others, and Most of the Riggers Do Non-Rigging Work.**

Although it is true that riggers do need certain skills to hoist heavy objects into the air, the other skills that the Board found distinctive are shared by others. Fall protection qualifications are shared by riggers and many other stagehands because they also perform work at extreme heights. For instance, those stagehands

21

who do lighting at heights or hang banners must wear personal protective equipment, such as harnesses, to protect against falls, just like riggers.

Conversely, most of the riggers do non-rigging work—that is work outside the designated unit—more than half their total work time. Out of 66 riggers, 14 of them only did rigging work. The rest did other stagehand work, such as being a seamstress, working spot lights, working as a climber, or as a general stagehand. One rigger estimated that he spent 50% of his time doing non-rigging work. The fact that so many riggers do a significant amount of work outside the designated unit further demonstrates that the inappropriateness of the Board's decision.

### E.     All Stagehands Have Common Supervision.

There is only one show supervisor at every show to oversee all the stagehands, with the larger shows sometimes having a rigging manager when there is more complicated rigging work to be done. The fact there may be a rigging manager at some, but not all, shows does not make the riggers' interests different from the other stagehands. Indeed, one of the main duties of the rigger manager is to ensure the safety of the entire crew—not just riggers. There are no departments at Rhino, and all stagehands—riggers and non-riggers alike—report to the same supervisors. They all attend safety meetings together given by the same supervisor. They all get their assignments from the same supervisors, and they all get told whether they can leave or must stay by the same supervisor.

22

### F.     Riggers Have Historically Been In a Bargaining Unit With Other Stagehands in Seattle.

Union business agent, Aaron Gorseth, testified that the Union, IATSE Local 15, has around 70 collective bargaining agreements ("CBA") (A. 347). One of those agreements is referred to as "The Big 4" agreement (A. 346). The CBA covers the Seattle Opera Pacific Northwest Ballet, the Seattle Symphony, and Benaroya Hall (A. 346, 439). The Big 4 agreement covers 12 or 14 job classifications, with stagehands (referred to as grips) and riggers being in the same bargaining unit (A. 348-49). IATSE Local 15 CBA with Paramount also includes both stagehands and riggers (A. 351-52, 440). The same is true for the Seattle Center, Langston Hughes Performing Arts Center, and Local 15's "general contract" that covers employers who do short-term productions in the Seattle area (A. 351-52, 354-57, 441-42). Out of the 70 Local 15 CBAs, Gorseth testified that only three or four are rigger-only CBAs (A. 358). Gorseth, however, could only specifically identify one CBA that was a rigger-only agreement. That one was with Dictalay Rigging, which, it turns, only employs riggers (A. 357).

Riggers in the Seattle area have historically been in the same bargaining unit with other stagehands. Fracturing Rhino's riggers into its own bargaining unit does not make sense to be the rare exception, especially because Rhino's employees are organized as a single group—that being stagehands.

### G.    Rhino Met Its Burden of Showing That The Excluded Workers Have An Overwhelming Community of Interest With Riggers.

The undisputed record evidence establishes an almost complete overlap of community of interests between the riggers and the excluded workers based on the eight factors listed in *Blue Man* to establish an overwhelming community of interest. Rhino met seven of the eight factors, specifically:

1.    All Rhino employees have the same method of payment;

2.    All Rhino employees have the same hours of work;

3.    All Rhino employees have identical benefits;

4.    Riggers and non-riggers report to the show supervisor;

5.    The contact between riggers and non-riggers is frequent and a necessary part of putting on a show;

6.    The work functions of riggers and non-riggers significantly overlap; and

7.    Riggers and non-riggers have historically been part of a single bargaining unit, particularly in the Pacific Northwest.

The only factor not entirely met is that riggers are trained and have skills that many non-riggers do not have.[5]

---

[5] The Board found that working at heights was a critical distinctive skill, which it is not. Rope access technicians, truss light operators, and some spot light operators and climbers, for example, also work at heights and use similar safety equipment.

Because the Board ignored this substantial evidence and, instead, blindly followed the Union's requested unit determination, the Board's Decision and Order was arbitrary, capricious, and an abuse of discretion. Accordingly, the Court should overturn the Board's Decision and Order. *See Sundor Brands*, 168 F.3d at 519-20 (granting petition for review and denying Board's application for enforcement because three factors that the Board relied upon for its unit determination were not supported by the record evidence).

III.  **IF THE COURT FINDS THERE IS NO OVERWHELMING COMMUNITY OF INTEREST, THEN THE COURT SHOULD REJECT THE BOARD'S USE OF THE "OVERWHELMING COMMUNITY OF INTEREST" TEST AS STATED IN *SPECIALTY HEALTHCARE AND REHABILITATION CENTER OF MOBILE*, 357 NLRB NO. 83 (2011) BECAUSE IT VIOLATES THE NLRA AND THE ADMINISTRATIVE PROCEDURES ACT.**

A.  **The Initial Unit Determination Methodology Announced in *Specialty Healthcare* And Applied Here Violates Section 9(b) Because The Board Does Not Determine Initial Units "In Each Case."**

Since the issuance of its decision in *Specialty Healthcare,* the Board has abandoned its statutory obligation under Section 9(b) to determine the appropriate unit in each case. *See NLRB v. WKRG-TV, Inc.,* 470 F.2d 1302, 1310 (5th Cir. 1973) ("Before a bargaining order is issued, it should be determined that the unit that the union is seeking to represent contains a sufficient commonality of interest to be deemed 'appropriate' within the meaning of the NLRA"). In practice, the Board instead has established and applied a rule that functionally equates all

employees in any "readily identifiable group" with "an appropriate unit." Thus, if a petitioner seeks all the employees in any "readily identifiable group," the Board's analysis effectively ends. This does not constitute the requisite analysis of what is appropriate in each case. *See NLRB v. Yeshiva University,* 444 U.S. 672, 691 (1980) (noting that the Board cannot make unit determinations based on "conclusory rationales"); *NLRB v. Purnell's Pride, Inc.*, 609 F.2d 1153, 1156-57 (5th Cir. 1980) ("The unit determination will be upheld only if the Board has indicated clearly how the facts of the case, analyzed in light of the policies underlying the community of interest test, support its appraisal of the significance of each factor.").

The Board has attempted to avoid this legal infirmity by asserting that a petitioner's request is subject to review "in each case," first by determining if the "readily identifiable group" shares a community of interest and is thus, in itself, appropriate; and, second, by determining if other excluded employees share such an "overwhelming community of interest" that their inclusion is required. *See, e.g.*, *Guide Dogs for the Blind, Inc.*, 359 NLRB No. 151 (2013); *Northrop Grumman Shipbuilding*, *Inc.*, 357 NLRB No. 163 (2011); *DTG Operations, Inc.,* 357 NLRB No. 175 (2011). In practice, however, this alleged case-by-case analysis has constituted little more than lip service to the Board's statutory obligation. As the post-*Specialty Healthcare* full board decisions noted below demonstrate, if a

petitioner seeks a unit composed either of all of the employees that share the same job title or classification, or all the employees in the same department or analogous administrative division, such a unit is invariably deemed appropriate and cannot be expanded. *See also* footnote 8, *infra*.

In the ordinary case, the proposed job classification unit or departmental unit often meets the first step in the *Specialty Healthcare* inquiry because there is a "readily identifiable group" that shares a "community of interest." As to the second step of that inquiry, where the unit sought is a departmental or classification unit, the Board has *never* found that any other employees share "an overwhelming community of interest" with the petitioned-for group. Thus, this portion of the *Specialty Healthcare* analysis has proven to be illusory wherever the petitioner seeks to organize all of the employees within a job classification or all of the employees within a department.

*Specialty Healthcare* thus stands for the new and radical proposition that classification or departmental units are *de facto* appropriate. Factors such as identical work location, common upper level supervision, the applicability of the same pay system, same personnel policies, same benefits, same work, same qualifications, work related contact, functional integration and employee interchange, which exist in varying degrees in all the cases noted below, have never been found by the Board majority to be sufficient to establish an

27

"overwhelming community of interest." Effectively, the bar is so high, that the second inquiry can rarely be met. Thus, under the Board's *Specialty Healthcare* approach, a classification or departmental unit in practice is irrebuttably appropriate.

A review of the Board's post-*Specialty Healthcare* precedent illuminates this reality. Including *Specialty Healthcare*, the Board has issued fully explicated decisions in ten cases involving the so-called "micro unit" issue.[6]

In *Guide Dogs for the Blind*, 359 NLRB No. 151, the Board found appropriate a unit of approximately 33 employees in an integrated operation of approximately 75 employees all engaged in the breeding, care, training and placement of guide dogs. The proposed unit, confined to the "training department" was found appropriate despite the fact that all employees shared similar benefits, were subject to identical policies, common overall supervision, experienced interdepartmental interchange, and worked in a single integrated operation. Under

---

[6] It is not the size of the post-*Specialty Healthcare* units that is in issue. Rather, it is the fact that the unit constitutes only a portion of what would otherwise be deemed the appropriate unit under the pre-*Specialty Healthcare* "sufficient community of interest" test. This case is illustrative. The issue is not the number of riggers and other workers there are in the requested unit. The issue is that the unit is an unworkable and impermissible portion of the presumptive, traditional wall-to-wall unit.

*Specialty Healthcare*, the employer's administrative placement of the requested employees in a separate "department" trumped all other considerations.

In *DTG Operations, Inc.,* 357 NLRB No. 175, the Board reversed the Regional Director and found appropriate a unit of 31 rental service agents and lead rental service agents out of a workforce of 109 employees working at a single integrated rental car operation at the Denver airport because they shared the same job classification; notwithstanding that all of the employees were subject to common overall supervision and the same policies, enjoyed a similar wage structure, and had "an extensive amount of interchange between classifications." *DTG*, at *29, (2011). Yet again, the unitary classification of the requested employees was dispositive.

In *Northrop Grumman Shipbuilding Co.*, 357 NLRB No. 163, the Board found a subset of the employer's technical employees to be an appropriate unit solely because the proposed unit was co-extensive with a department. The majority reached this result even though all of the employer's technical employees worked in the same facility, shared the same salary structure and personnel policies, shared similar technical training, enjoyed the same benefits, had daily work-related contact, were subject to the same upper level management supervision, and had duties functionally integrated with all the other technical employees. Rather, the fact that the requested employees comprised a single technical department

29

dominated not only over all other facts, but also over long-standing Board doctrine that an appropriate unit should include all technical employees who share a community of interest. *See, e.g., PECO Energy Co.*, 322 NLRB 1074, 1085 (1997); *see also Westinghouse Electric Corp. (Westinghouse II)*, 300 NLRB 834 (1990); *Westinghouse Electric Corp. (Westinghouse I)*, 137 NLRB 332 (1962).

And in *Fraser Engineering*, 359 NLRB No. 80 (2013), the Board majority found a unit of 26 welders, pipefitters, plumbers and HVAC technicians employed by Fraser Engineering to be appropriate, despite the fact that it excluded 13 welders, pipefitters, plumbers and HVAC technicians employed by Fraser Petroleum, a wholly owned subsidiary.[7] The fact that the 26 employees were housed in the same "administrative unit," akin to a department, was again dispositive, despite the fact that the job function and requirements were the same, they were housed in the same facility, were subject to common supervision, were subject to the same wage system, were covered by the same handbook and personnel policies, were included in the same group health, dental and vision plans, covered under the same group life insurance policy, 401(k) plan, and employee stock ownership plan. Once again the Board elevated the departmental or

---

[7] To be sure, Frasier Engineering and Frasier Petroleum were legally separate entities that were arguably not the same employer. However, the Board's failure to even address this issue demonstrates that the *Specialty Healthcare* standard is in practice virtually irrebuttable.

administrative form over all the commonly shared factors that are actually related to the substance of collective bargaining.

Those full cases in which the Board found a requested "micro-unit" inappropriate are equally instructive. In *Neiman Marcus Group, Inc.*, 361 NLRB No. 11 (2014), the Board found a unit of sales associates who sold shoes in two different departments inappropriate since the request was not confined to a single department, and did not encompass all of the employees classified as sales associates. In *Odwalla*, *Inc.*, 357 NLRB No. 132 (2011), the Board rejected a proposed unit, which combined a number of job classifications but which excluded the classification of merchandiser, on the ground that the proposed unit did not reflect "classification" or "departmental" lines. Finally, in *ASV, Inc.*, 360 NLRB No. 138 (2014), the Board cited with approval the decision of an Acting Regional Director finding inappropriate a unit request for a portion of the employer's assemblers and parts employees who performed "undercarriage" work finding, once again, that the request did not encompass all the employees within a classification and did not encompass a department.

At bottom, the Board's fully explicated decisions reveal that it has adopted a new standard under which it will find any petitioned-for unit that consists of all employees in a classification or job title, or all employees in a department

31

irrebuttably appropriate.[8] Under the *Specialty Healthcare* rubric, as the dissent in

*DTG* correctly noted:

> As long as a union does not make the mistake of petitioning for a unit that consists of only a part of a group of employees in a particular classification, [or] department . . . it will be impossible for a party to prove that an overwhelming community of interests exists with excluded employees. Board review of the scope of the unit has now been rendered largely irrelevant.

*DTG*, at * 11. The observation is correct, and this mechanistic application of such a

rule cannot be squared with the obligation of the Board under Section 9(b) to

determine the appropriate unit in each case.[9]

---

[8]  The cases in which the Board has issued a short-form order (not published in Board volumes) adopting a Regional Director's post-*Specialty Healthcare* approach are to the same effect. *See, e.g., Swissport USA, Inc.*, No. 29-RC-144512 (March 26, 2015) (cleaners only unit deemed appropriate classification unit); *CNH America, LLC*, No. 25-RC-116569 (January 16, 2014) (welders only unit deemed appropriate classification unit); *Nestle Dryer's Ice Cream*, No. 31-RC-66625 (Dec. 28, 2011) (unit of maintenance employees deemed appropriate where proposed co-extensive with maintenance department); *First Aviation Servs., Inc.*, No. 22-RC-061300 (line service technicians only unit deemed appropriate classification unit); *Prevost Car U.S.*, No. 03-RC-071843 (Mar. 16, 2012) (full time assemblers only unit deemed appropriate classification unit).

[9]  The Board's radical departure from precedent and statutory mandate with the new "overwhelming community of interest" test does not extend to a concern over the Board's presumption that a traditional craft unit is appropriate. Section 9(b)(2) and established precedent favor approval of craft units. Specifically, Section 9(b)(2) prohibits the Board from deciding that any craft is inappropriate for collective bargaining purposes on the ground that a different unit has been established by a prior Board determination, unless a majority of the employees in the proposed craft unit votes against separate representation. The Board has described a craft unit as "one consisting of a distinct and homogenous group of

The Board has argued that its approach is sanctioned under this Court's decision in *Blue Man Vegas LLC v. NLRB,* 529 F.3d 417 (D.C. Cir. 2008). But *Blue Man* does not support the Board's approach. That decision does not involve an initial bargaining unit determination as does *Specialty Healthcare* and its progeny, including this case. *Blue Man* instead concerned the propriety of adding a historically excluded group of employees to a bargaining unit that had existed for several years, was represented by the same union and had engaged in collective bargaining negotiations over that extended period. In the factual circumstances of the case, and relying heavily on the parties' long bargaining history, the NLRB's Regional Director found the historical unit to be appropriate and the Board affirmed. The propriety of the unit determination reached the D.C. Circuit in the wake of a technical refusal to bargain. The court affirmed the Board, and in doing so found the unit appropriate pursuant to an "overwhelming community of interest" standard. This standard had not been applied to initial bargaining unit determinations, but had been reserved for *accretion* situations. *See, e.g.*, *Safeway Stores, Inc.*, 256 NLRB 918 (1981); *See also*, *NV Energy*, 362 NLRB No. 5, slip

---

skilled journeymen craftsmen, who together with helpers or apprentices, are primarily engaged in the performance of tasks which are not performed by other employees and which require the use of substantial craft skills and specialized tools and equipment." *Burns & Roe Services, Corp.*, 313 NLRB 1307, 1308 (1994). The same deferential treatment of departmental and classification units, however, is inconsistent with the Act and Board precedent.

op. at 3 (2015); *AT Wall*, 361 NLRB No. 62, at *3 (2014); *Milwaukee City Ctr., LLC*, 354 NLRB 551, 552-553 (2009); *Frontier Tel. of Rochester, Inc.*, 344 NLRB 1270, 1271 (2005), enf'd. by 181 F. App'x. 85 (2d Cir. 2006).

The distinction between initial determinations and accretions is crucial. In a classic accretion, a group of employees is added to a pre-existing bargaining unit without the right to vote by secret ballot whether they wish to be represented. Accretion is therefore permissible only where inclusion of the excluded group is compelled by virtue of their "overwhelming community of interest." *See NLRB v. Superior Protection*, *Inc.,* 401 F 3d 282, 288 (5th Cir. 2005) (quotations omitted) (holding that accretion is appropriate "only when the additional employees have little or no separate group identity and thus cannot be considered to be a separate appropriate unit and when the additional employees share an overwhelming community of interest with the preexisting unit to which they are accreted"). In an accretion, the inclusion bar should be high, because those to be included have no right to vote on whether to engage in collective bargaining. Such is not the case in an initial unit determination.

*Blue Man* did not present a classic accretion scenario. The Court, however, either by imprecise analogy or more fundamental error imported the accretion standard into that case. This was plainly not the only misconstruction at play in *Blue Man*. To the extent it purportedly stands for the proposition that the

34

"overwhelming" standard applies to initial unit determinations, it is simply incorrect and unsupported by the Board's then-extant representation case jurisprudence. It relies on only two Board cases *Jewish Hospital of Cincinnati*, 223 NLRB 614 (1976), and *Holiday Inn City Center*, 332 NLRB 1246 (2000). Contrary to the *Blue Man* court's assertion, the Board did not find in either of those decisions that an "overwhelming community of interest" standard is applicable in initial unit determinations. Thus, neither *Jewish Hospital of Cincinnati* nor *Holiday Inn City Center* supports the proposition for which they are cited. The factual uniqueness of the underlying case and the misconstruction of Board precedent may account for the fact that *Blue Man*'s overwhelming community of interest test is at odds with the view of this and virtually all other reviewing Circuits. *See, e.g.*, *NLRB v. Purnell's Pride, Inc*., 609 F.2d 1153 (5th Cir. 1980); *NLRB v. ADT Security Services, Inc.,* 689 F. 3d 628, 633 (6th Cir. 2012); *NLRB v. Great Western Produce, Inc.* 839 F.2d 555 (9th Cir. 1988). The Board in *Specialty Healthcare* compounds the matter by improperly importing the accretion standard into the initial unit determination analysis with the result of establishing a *per se* rule that invariably finds a "classification" or "departmental" unit appropriate in contravention of the requirements of Section 9(b).

**B.    The New Standard Does Not Assess A Proposed Unit In Terms Of Its Propriety "For The Purposes Of Collective-Bargaining."**

The congressional directive to the Board in Section 9(b) is a functional one. It mandates that the Board make an initial unit determination that is properly suited to the conduct of collective bargaining. Although the Board has some degree of discretion in meeting this statutory command, its discretion is not absolute. Its determination must be tethered to the central purposes of the Act. Thus, units found appropriate by the Board must both be suited to the purpose of collective bargaining and must be consistent with the Board's overarching obligation to create an efficient and stable bargaining structure that assures industrial peace. *See, e.g.*, *Pittsburgh Plate Glass Co. v. NLRB*, 313 U.S. 146, 165 (1941); *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 211 (1964); *Local 24, Int'l Brotherhood of Teamsters v. Oliver*, 358 U.S. 283, 295 (1959); *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 674 (1981) (citing, *Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937).

The Board has never explained why the *Specialty Healthcare* standard results in either a bargaining unit that is consistent with the purposes of the Act or one more consistent with its purposes than a unit configured under the Board's long-standing traditional standard. Why is a multiplicity of bargaining units artificially confined to a job classification suited at all to collective bargaining? Why are such units to be preferred over units configured on the basis of common

36

personnel policies, common overall supervision, functional integration, and common pay and benefit systems—all the grist of collective-bargaining negotiations? The Board's silence on this central issue is deafening. *See Purnell's Pride*, 609 F.2d at 1156 (holding that to properly determine a bargaining unit, "the Board must assign a relative weight to each of the competing factors it considers"). The simple conclusion is that the *Specialty Healthcare* standard does *not* advance the goals of collective bargaining as mandated by Section 9(b). Indeed, it is precisely to the opposite effect.

In the present case, for example, Rhino's stagehands (consisting of lighting, audio, riggers, wardrobe, props, and basic stagehands) work to put together concerts and other events. *Rhino Northwest*, 363 NLRB No. 72, at *3. Under the Board's representation case jurisprudence that applied for more than fifty years before *Specialty Healthcare,* a single company-wide unit would have been presumptively appropriate. *See, e.g.*, *I. Magnin & Co.*, 119 NLRB 642 (1957); *Haag Drug Co.*, 169 NLRB 877 (1968); *Levitz Furniture Co.*, 192 NLRB 61 (1971); *Charrette Drafting Supplies Corp.*, 275 NLRB 1294 (1985). Under the *Specialty Healthcare* rubric, however, these same stagehands could now be subdivided into 21 separate, "appropriate" bargaining units. *See* footnote 4, *supra.*

The balkanization of a workforce in this manner is diametrically opposed to creating an efficient and rational bargaining framework, and fostering labor

stability as mandated by Section 9(b). Thus, such an arrangement would result in the prospect of near ceaseless negotiations for 21 collective-bargaining contracts, each of which having its own expiration date, would multiply the risk of discrete work stoppages affecting an otherwise integrated work force. In addition, the *Specialty Healthcare* bargaining scheme would result in serial bargaining with the attendant inevitability of poisoning the process through whipsaw and leap-frog tactics. Most importantly, however, there potentially would be 21 different sets of negotiations resulting in 21 divergent contractual resolutions of such commonly shared matters as wage systems, benefits, including group health and other group insurance, retirement programs, seniority, hours of employment, personnel policies, work rules, and all other common "terms and conditions of employment." These matters constitute the meat of the collective-bargaining process: and where they are common to all employees, they should not be subject to multiple negotiations. *See NLRB v. Catalytic Indus. Maint. Co. (CIMCO)*, 964 F.2d 513, 518 (5th Cir. 1992) (quotations omitted) ("the most reliable indicium of common interest among employees is similarity of their work, skills, qualifications, duties and working conditions"). Yet this is exactly what the real world application of the *Specialty Healthcare* rubric yields; and is precisely the result Congress made clear is unacceptable.

38

The post-*Specialty Healthcare* bargaining framework, when viewed from the employee side of the table, is no less problematic or inconsistent with the purposes of the statute. The most fundamental precept of collective bargaining is that there is strength in numbers. Except in rare situations, a small, discrete segment of any workforce, exercises exponentially less leverage at the bargaining table than does a company-wide or similarly comprehensive grouping of employees. In the real world, negotiation is invariably about leverage. In labor negotiations, from the employer's side of the table, that leverage often boils down to whether it is in its interest to accede to the employees' collective economic demands, or to sustain the economic losses that would result from the employees' collective withholding of services. It is axiomatic in most instances that the smaller the group, the less the economic impact of their withholding of services; and, thus, the less the employees' leverage. Classification or departmental units make organizing easier, but make bargaining less effective. Section 9(b), indeed the Act in its entirety, is concerned with the latter, not the former.

Under *Specialty Healthcare*, unit making is not only less effective for employees in terms of bargaining, it also is contrary to employees' best interests in terms of contract administration. A multiplicity of bargaining units carries with it the very real possibility of contractual language that is ultimately injurious to employees. For example, a common feature of many collective-bargaining

39

agreements is the imposition of "unit seniority" preferences in bidding and promotions. Such language, repeated over multiple classification based units will have a very predictable "silo" effect, making it difficult for employees to transfer between classifications, develop new skills, or avail themselves of higher-paying or other career advancement opportunities.

The adoption and application of the *Specialty Healthcare* standard does not reflect the type of policy choice that the Board concededly has discretion to make. Rather, it represents a choice demonstrably at odds with the commands of the statute—a choice the Board is not empowered to make.

### C.     Contrary To The Statute, The New Standard Reverses The Presumption In Favor of Larger Bargaining Units.

Section 9(b) also includes the mandate to approve a unit configuration that "assures" employees their "fullest freedom" in exercising protected rights. *See NLRB v. Fid. Maint. & Constr. Co.*, 424 F.2d 707, 709 (5th Cir. 1970) ("Section 9(b) of the Act directs the Board to fashion its bargaining unit determination in such a manner as to insure to employees the fullest freedom in exercising their rights guaranteed by the Act"). This mandate is satisfied when broader bargaining units are approved.

The plain language of the statute makes clear Congress's presumption in favor of larger, broader bargaining units. Section 9(b) specifically makes reference to "employer" units and "plant" units, or, in the alternative, units that are "a

40

subdivision thereof." Although "departmental" units, "employee classification" units, or any of the other more narrowly drawn units found appropriate by the Board in the wake of *Specialty Healthcare* might arguably be deemed appropriate under the "subdivision" alternative, the specific statutory reference to employer-wide and plant-wide units in the text of 9(b), and the alternative "subdivision" reference, is indicative of a presumption in favor of broader units in most industrial settings. This presumption makes sense because, as this Court has noted, "the designation of a small unit that excludes employees with common skills, attitudes, and economic interests may unnecessarily curtail the union's bargaining power and may generate destructive fractionalization and in-fighting among employees." *Purnell's Pride*, 609 F.2d at 1156. Indeed as Chairman Biddle persuasively explained, the comprehensive unit—all eligible employees at the facility—is the presumption:

> Section 9(b) of the Wagner bill provides that the Board shall decide the unit appropriate for the purpose of collective bargaining. This, as indicated by the Act, may be a craft, plant or employer unit… If the employees themselves could make the decision without proper consideration of the elements which should constitute the appropriate units they could in any given instance defeat the practical significance of the majority rule; *and, by breaking off into small groups, could make it impossible for the employer to run his plant*.

*Hearings Before the S. Comm. On Educ. & Lab. on S. 1958*, 74th Cong. 82 (1935) (testimony of Francis Biddle, then Chairman of the precursor to the Board)

(emphasis added), reprinted in 1 NLRB, *Legislative History of the Labor Management Relations Act of 1947,* at 1458 (1948).

Until the issuance of *Specialty Healthcare*, the "presumptively" appropriate units that the Board for decades had found in most industries plainly reflected this statutory preference. *See, e.g.*, *Kalamazoo Paper Box Corp.* 136 NLRB 134, 136 (1962) ("a plantwide unit is presumptively appropriate under the Act, and a community of interest inherently exists among such employees"); *Jackson Liquors*, 208 NLRB 807 (1974) (plant/ employer wide unit is presumptively appropriate); *Appliance Supply Co*., 127 NLRB 319 (1960) (unit of production and maintenance employees is presumptively appropriate); *Jersey Shore Nursing & Rehabilitation Center*, 305 NLRB 603 (1998) (service and maintenance unit in nursing home is presumptively appropriate); *Daniel Finley Allen & Co.,* 303 NLRB 846, 847 (1991) (unit of all drivers and helpers presumptively appropriate). For nearly 60 years, the Board has consistently recognized that "storewide" bargaining units are presumptively appropriate in the retail industry due to nature of the employer's overriding business objective to sell. *See, e.g., May Department Stores Co.*, 97 NLRB 1007, 1008 (1952) ("storewide unit" called "the optimum unit for the purpose of collective bargaining" in the retail industry); *I. Magnin & Co.*, 119 NLRB 642, 643 (1957) (stating that the Board "has long regarded a storewide unit of all selling and nonselling employees as a basically appropriate unit in the retail

industry"); *Montgomery Ward & Co.*, 150 NLRB 598, 600 (1964) (recognizing that "storewide or overall unit is presumptively appropriate for the purposes of collective bargaining"); *Sears, Roebuck & Co.*, 261 NLRB 245, 346 (1982) (calling a storewide unit "presumptively appropriate"); *see also Charrette Drafting Supplies Corp.*, 275 NLRB 1294, 1297 (1985) (holding that in retail context "the Board finds a single-facility unit presumptively appropriate").

The Board expressly recognized the continued validity of existing bargaining unit presumptions throughout its decision in *Specialty Healthcare*. For example, the Board stated: "We note that the Board has developed various presumptions and special industry and occupation rules in the course of adjudication. Our holding today is not intended to disturb any rules applicable only in specific industries…." *Specialty Healthcare*, 357 NLRB at *13 n.29. Indeed, in subsequent cases, the Board has continued to recognize that *Specialty Healthcare* does not displace existing bargaining unit presumptions in industries outside the non-acute care healthcare industry. *See, e.g.*, *Northrop Grumman*, 357 NLRB at *5 (noting that "the holding in *Specialty* was 'not intended to disturb any rules applicable only in specific industries'" and concluding that "to the extent that the Board has developed special rules applicable to technical employees . . . those rules remain applicable."); *DTG*, 357 NLRB at *5 n.16 (stating that the Board

43

"will also apply established presumptions" that exist in specific industries for bargaining unit determinations).

Prior to *Specialty Healthcare*, the proper inquiry under the long-standing Board standard had been whether disputed groups of employees shared a sufficient community of interest with those sought by the petitioner as to require their inclusion. *See, e.g.*, *Aerospace Corp.*, 331 NLRB 561, at *5 n.16 (2000) (unit of laboratory mechanics did not share a "sufficient community of interest to be included in the petitioned-for unit."); *Science Applications Corp.*, 309 NLRB 373 at *1 n.1 (1992) (software development employees lacked a "sufficient community of interest" with petitioned for unit to require their inclusion); *Typecraft Press*, 275 NLRB 553, at *1 n.1 (1985) ("paste-up" employees and typesetters shared sufficient community of interest with petitioned for employees to warrant inclusion in the unit); *Hallam & Boggs Truck & Implement Co.*, 92 NLRB 1339, 1340 (1951) ("set up men" shared sufficient community of interest with petitioned-for operating and maintenance employees to warrant inclusion in the unit). Under the standard established in *Specialty Healthcare*, and applied in this case, as long as the group sought by the petitioner has a recognizable identity the Board generally accepts the petitioned-for group as appropriate and no other employees can be added unless the party seeking inclusion and the right to exercise their protected rights can show the excluded employees have an *overwhelming* community of

interest with the petitioned-for group. *See Specialty Healthcare*, 357 NLRB at *1. This new standard takes the statutory presumption in favor of broad units and stands it on its head. Under *Specialty Healthcare*, the presumptively appropriate unit is always *the smallest identifiable group of employees*, not the broadest. This standard is contrary to decades of Board law, and contrary to Section 9(b) of the Act.

### D. The New Standard Violates The Act By Failing to Consider All Of The Rights Guaranteed By The Act When Making Unit Determinations.

Section 9(b) of the 1935 Wagner Act stated that the Board's unit determinations were "to insure to employees the full benefit of their right to self-organization, and to collective bargaining, and otherwise to effectuate the policies of this Act." Wagner Act, ch. 372, § 9(b), 49 Stat. 449, 453 (1935) (emphasis added). In 1947, as part of the Labor Management Relations Act ("LMRA"), Congress amended this language in Section 9(b) to state that unit determinations must "assure to employees the fullest freedom in exercising the rights guaranteed by [the] Act." 29 U.S.C. § 159(b). The LMRA also amended Section 7 of the Act so that, in addition to protecting the right of employees to engage in protected activities, the Act protected "the right to refrain from any or all of such activities." 29 U.S.C. § 157. These important amendments to the Act "emphasized that one of the principal purposes of the [Act] is to give employees full freedom to choose or

45

not to choose representatives for collective bargaining." H.R. Rep. No. 80-510, at 47 (1947) (Conf. Rep.), *reprinted* in 1 NLRB, *Legislative History of the Labor Management Relations Act of 1947*, at 551. By guaranteeing "in express terms the right of employees to refrain from collective bargaining or concerted activities if they choose to do so," the belief was that the Act would "result in substantially larger measure of protection of those rights when bargaining units are being established than has heretofore been the practice." *Id.* Thus, the Act now requires the Board to consider the full range of employee rights—both to engage in collective bargaining and to refrain from it—when making bargaining unit determinations.

The construction of Section 9(b) adopted by the Board in *Specialty Healthcare* and its progeny fails to "assure" employees freedom in the exercise of their rights under the Act. It does this by improperly focusing solely on the Section 7 rights of employees in the petitioned-for unit, and by disregarding the Section 7 rights of excluded employees unless the excluded employees can show that they share an "overwhelming community of interests" with those of the included employees. As noted by the dissenting Board Member in *Macy's*:

> All statutory employees have Section 7 rights, whether or not they are initially included in the petitioned-for unit. The Act's two most important core principles governing elections – the concepts of "exclusive bargaining representation" and "majority rule," both set forth in Section 9(a) – are completely dependent on the scope of

> the unit. For these reasons, the Board's unit determination must, in part, consider whether the rights of nonpetitioned-for employees warrant inclusion in any bargaining unit. Such inquiry, however, is effectively precluded under *Specialty*.

*Macy's Inc. and & Local 1445, UFCWU*, 361 NLRB No. 4, *32 (2014).

By artificially narrowing the scope of the bargaining unit, the Board impermissibly impairs the rights of unit employees. Because the *Specialty Healthcare* standard applied by the Board here fails to "assure to employees the fullest freedom in exercising the rights guaranteed by [the] Act," it violates Section 9(b).

### E.   The Adoption Of The New Standard Was An Abuse Of Discretion And Violates The Administrative Procedure Act.

#### 1.   Rulemaking is distinct from adjudication under the APA.

Rulemaking is the "agency process for formulating, amending, or repealing a rule." 5 U.S.C. § 551(5). A "rule" is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id*. § 551(4). The APA requires that an agency follow certain procedures whenever implementing a new rule. For example, the agency must publish a notice of the proposed rulemaking in the Federal Register. *Id*. § 553(b). The agency must give the public an opportunity to participate in the rulemaking process "through submission of written data, views, or arguments" and the adopted rules must contain "a concise general statement of their basis and purpose." *Id.* § 553(c). And

47

the resulting new rule qualifies as final agency action, which is subject to judicial review in proper cases by anyone aggrieved by the new rule. *See id.* § 701-706.

Adjudication is quite different. Through adjudication, the agency issues an "order," which is "a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making." 5 U.S.C. § 551(6)-(7). Because an adjudicated order applies only to the particular parties to the dispute before the agency, other equally interested individuals or entities are not able to seek judicial review to challenge the agency's order. Unlike with rulemaking, a nonparty cannot directly challenge an agency's adjudication order until the agency applies the order against that nonparty in a subsequent case. *See Am. Fed'n of Lab. v. NLRB*, 308 U.S. 401, 411 (1940).

> 2. In *Specialty Healthcare*, the Board improperly used adjudication to implement a new generally applicable standard for determining bargaining units.

The parties in *Specialty Healthcare* never asked the Board to change its decades-old rule for defining bargaining units. Nevertheless, the Board decided to address that issue. Because the standard for determining bargaining units was not part of the parties' dispute, the APA prohibits the Board from addressing such a fundamental issue through adjudication. "Adjudications typically resolve disputes among specific individuals in specific cases, whereas rulemaking affects the rights of broad classes of unspecified individuals." *City of Arlington, Tex. v. F.C.C.*, 668

48

F.3d 229, 242 (5th Cir. 2012). An adjudicative order is only appropriate when it "interpret[s] the rights of a small number of parties properly before [the agency]." *Am. Airlines, Inc. v. Dep't of Transp.*, 202 F.3d 788, 798 (5th Cir. 2000). In *Specialty Healthcare*, the Board did not merely interpret the rights of the parties before it or resolve the parties' specific dispute. Instead, it entered a ruling regarding an issue that the parties never even mentioned, and which has a far-reaching impact on all businesses—not just the parties involved in that case.

An agency abuses its discretion when it "establishe[s] a new policy and then applie[s] that new policy to several" affected companies through adjudication. *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 628 (5th Cir. 2001). Adjudication is only appropriate to resolve disputes "which would have an immediate and determinable impact on specific factual scenarios." *City of Arlington*, 668 F.3d at 243. When the scope of an agency's ruling will only become clear after subsequent adjudications, the agency has engaged in "classic rulemaking." *Id.* In *Specialty Healthcare*, the Board purposefully announced a new standard whose effect stretched far beyond the specific parties and factual scenario presented in that case. To justify its use of adjudication to reach this result, the Board intimated that the new *Specialty Healthcare* standard would only apply when "determining if a proposed unit is an appropriate unit in nonacute health care facilities" and was not intended to disturb industry-specific presumptions and rules

49

developed by the Board in other cases. *Specialty Healthcare*, at \*12, \*13 n.29. But subsequent Board decisions—including in this case—demonstrate that the new policy for defining bargaining units is not confined to the factual context presented in *Specialty Healthcare*, but instead constitutes the new generally applicable policy for *all* employers across *all* industries. *See, e.g., DTG*, 357 NLRB No. 175 (rental-car facility); *Northrop Grumman*, 357 NLRB No. 163 (submarine and aircraft carrier manufacturer); *Odwalla*, 357 NLRB No. 132 (producer of fruit drinks). The Board abused its discretion and violated the APA by employing adjudication rather than rulemaking to enact such a sweeping change to its standard for determining initial bargaining units, and the Court should not apply the *Specialty Healthcare* standard in this case or any others.

3. <u>The Board's abuse of discretion was prejudicial error</u>.

The Board's abuse of discretion was not harmless. Although the doctrine of harmless error applies to violations of the APA, *see* 5 U.S.C. § 705, it only applies "when a mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of decision reached." *U.S. Steel Corp. v. E.P.A.*, 595 F.2d 207, 215 (5th Cir. 1979) (quotation omitted). "This Court has affirmed that absence of such prejudice must be clear for harmless error to be applicable." *Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 444 (5th Cir. 2001) (quotation omitted).

50

The Board's error in using adjudication rather than rulemaking to change its policy for defining bargaining units was not harmless. Instead of following the necessary rulemaking requirements, the Board changed its policy through adjudication and merely requested amicus briefs on the issue. The Board avoided its obligation to provide public notice of the rule change, receive comments, and provide responses to all significant comments to allow for immediate judicial review. *See Home Box Office, Inc. v. F.C.C.,* 567 F.2d 9, 35-36 (D.C. Cir. 1977). The Board's error in *Specialty Healthcare* is not "one that clearly had no bearing on the procedure used or the substance of decision reached." *U.S. Steel Corp.*, 595 F.2d at 215. It was a prejudicial abuse of discretion.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant the petition for review and deny enforcement of the Board's Order.

Respectfully submitted,

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

/s/ *Timothy A. Garnett*
Timothy A. Garnett, D.C. Bar #56657
Heidi Kuns Durr
7700 Bonhomme Avenue, Suite 650
St. Louis, Missouri 63105
Telephone: (314) 802-3940
timothy.garnett@ogletreedeakins.com
heidi.durr@ogletreedeakins.com

                    and

Brian E. Hayes
1909 K Street, N.W.
Suite 1000
Washington, D.C. 20006
Telephone: (202) 887-0855
brian.hayes@ogletreedeakins.com

Attorneys for Petitioner/Cross-Respondent

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this principal brief contains 11,304 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(e)(1).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 with Times New Roman 14 point font.


/s/ *Timothy A. Garnett*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 27, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system to be served on the following registered participants: Ruth Burdick, Linda Dreeben, Michael Hickson, and Dmitri Iglitzin.

The foregoing was served on the following non-registered participant by first class mail, postage prepaid, to:

John H. Ferguson
Associate General Counsel
National Labor Relations Board
Appellate and Supreme Court Litigation Branch
1015 Half Street, SE
Suite 8100
Washington, DC 20570


/s/ *Timothy A. Garnett*

26663677.1

54